UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SENVEST MASTER FUND, L.P. &
SENVEST TECHNOLOGY PARTNERS
MASTER FUND, L.P.,

                    Petitioners,

    v.

UNITED STATES OF AMERICA,

                    Respondent.

25 Civ. 01421 (RFT)

**OPINION AND ORDER**

Petitioners Senvest Master Fund, L.P. ("Senvest") and Senvest Technology Partners

Master Fund, L.P. ("Senvest Technology") filed this action under 26 U.S.C. § 7609 to quash the

Internal Revenue Service's administrative summonses issued to Morgan Stanley & Company LLC

and Morgan Stanley Fund Services USA LLC (together, "Morgan Stanley") (the "Petition"). (*See*

ECF 1, Pet.) Respondent moved to deny the Petition (the "Motion"). (*See* ECF 16, Mot.) For the

reasons set forth below, the Petition is DENIED and the Motion is DENIED AS MOOT.

**I.**

**STATEMENT OF FACTS**

Senvest and Senvest Technology (together, the "Funds") are limited partnerships formed

under the laws of the Cayman Islands. (*See* ECF 18, Declaration of Hoa Nguyen ("Nguyen Decl.")

¶ 4.) More than 50% of the Funds were owned by Canadian taxpayers Senvest Capital, Inc.

("Senvest Capital"), Richard Mashaal, and Jefferson Northern Inc. (together, the "Canadian

Taxpayers"). (*See id.*) The Canadian Taxpayers are under civil audit by the Canada Revenue

Agency ("CRA") for income taxes for tax years 2016 to 2021. (*See id.* ¶ 3.) On October 3, 2023,

the CRA sent Senvest Management, LLC ("Senvest Management"), the investment manager for

Senvest Capital and the Funds, document requests and questions as part of its ongoing tax

audit. (*See* ECF 1, Pet. ¶ 17.) On January 11, 2024, Senvest Management responded to the CRA's

document requests and produced quarterly account statements and quarterly reports of

securities holdings for each of the Funds between 2019 and 2021. (*See id.* ¶ 21.)

On February 15, 2024, the Internal Revenue Service ("IRS") received a written request

for information from the CRA pursuant to Article XXVII of the Convention Between the United

States of America and Canada with Respect to Taxes on Income and on Capital, signed on

September 26, 1980, and as amended by the Protocols done on June 14, 1983, March 28, 1984,

March 17, 1995, July 29, 1997, and September 21, 2007 (collectively, the "Treaty"). (*See* ECF 18,

Nguyen Decl. ¶ 2.) The request sought from Senvest Management records of daily transactions

in securities of the investment portfolios held by the Funds from January 1, 2019, to December

31, 2021. (*See id.* ¶ 5.) Under Canadian law, the taxation of each partner's partnership income

depends on the amount and character of that income in the hands of the partnership. (*See id.*

¶ 4.) According to the CRA, it attempted to obtain the requested information from Senvest

Management directly, but Senvest Management provided only quarterly snapshots of the

Funds' investment portfolios. (*See id.* ¶ 7.)

On April 10, the IRS sent a document request to Senvest Management, which stated that

"[t]his request for information is being made pursuant to the Exchange of Information article" of

the Treaty. (*Id.* ¶ 8.)[1] The request sought, by May 10, 2024, accounting data (details of the daily

---

[1]     Unless otherwise indicated, this opinion and order omits internal quotation marks, citations, and alterations from quoted text.

transactions in the securities included in the Enfusion databases) for tax years ended 2019, 2020, and 2021 of Senvest Technology and Senvest. (*See* ECF 18-1, Apr. 2024 Info. Document Request ("Apr. 2024 Doc. Req.") at 2.)[2]

On May 2, the IRS and counsel for Senvest Management discussed the document request. Senvest Management informed the IRS that it lacked the "manpower" to create the requested daily transaction records. (ECF 18, Nguyen Decl. ¶ 9.) Instead, Senvest Management offered to provide monthly reports of holdings for each of the Funds for the years 2019 to 2021. (*See id.*; ECF 1, Pet. ¶ 25.) The IRS informed Senvest Management that it would check whether the monthly reports would be acceptable to the CRA. (*See* ECF 18, Nguyen Decl. ¶ 9.)

On May 24, the IRS, CRA, and Senvest Management participated in a conference call to discuss the IRS's request. (*See* ECF 1, Pet. ¶ 26.) Senvest Management again offered to provide the monthly reports, but the CRA declined that offer and reiterated that for the purposes of its audit, it required documents detailing daily transactions in securities and investments for accounts owned by the Funds between 2019 and 2021 (the "Requested Documents"). (*See id.*; ECF 18, Nguyen Decl. ¶ 10.) The CRA believed that Senvest Management possessed the Requested Documents because Senvest Management had previously provided the CRA with a ledger prepared by Morgan Stanley showing daily transactions in securities for the Funds' investment portfolios for 2016 to 2018 (the "Ledger"). (*See* ECF 18, Nguyen Decl. ¶ 11.) In

---

[2]     Enfusion is a cloud-native investment management platform that integrates front, middle, and back-office functions, designed to streamline operations for asset managers and hedge funds. *See* https://cwan.com/press-releases/enfusion-platform-an-integrated-front-middle-and-back-office-experience/ (last visited on  Mar. 6, 2026).

response, Senvest Management stated that the Ledger was prepared for an unrelated purpose, and a similar ledger had not been prepared for 2019 to 2021. (*See id.* ¶ 12.)

On August 7, the IRS issued a summons (the "August 2024 Senvest Summons") to Senvest Management for "[a]ll documents, including periodic investment portfolio account statements, relating to all transactions in securities and investments for each account owned, directly or indirectly" by the Funds for the period from January 1, 2019, through December 31, 2021. (ECF 18, Nguyen Decl. ¶ 13; ECF 18-2, Aug. 2024 IRS Summons to Senvest Mgmt. ("Aug. 2024 Summons") at 6.)

On September 6, 2024 Senvest Management objected to the August 2024 Senvest Summons, arguing that it was "overly broad" and "unduly burdensome" because it sought "all documents" and because it sought information that Senvest Management did not maintain in the ordinary course of business. (ECF 1, Pet. ¶ 29.) Instead, Senvest Management produced monthly statements of the Funds' securities holdings for 2019 to 2021, as well as quarterly snapshots of the Funds' investment portfolios that Senvest Management had previously produced to the CRA. (*See id.* ¶ 29; ECF 18, Nguyen Decl. ¶ 14.)

On October 24, 2024, the CRA informed the IRS that the monthly statements were insufficient, because the CRA's analysis of the Ledger showed that 52% of the positions initiated by the Funds between 2016 and 2018 were held for fewer than 30 days. (*See id*. ¶ 15.) Since those positions would not have appeared as holdings of the Funds at the end of each month, the positions would not be captured by monthly statements. (*See id.*) The CRA further explained that details regarding the Funds' daily transactions in securities were necessary for its audit to substantiate the Funds' activity and to determine if the income earned by the Funds was

attributable to or taxable to some of or all the Canadian Taxpayers as business income or as a capital gain under Canadian tax law. (*See id.*) The CRA therefore requested that the IRS obtain the Requested Documents from Morgan Stanley, which served as Senvest Management's custodian and which had prepared the Ledger. (*See id.* ¶ 16.)

On November 1, 2024, the IRS asked whether Senvest Management could provide the daily transaction records, and Senvest Management's counsel responded that he needed to speak with his client and would follow up. (*See id.* ¶ 17.) Petitioners allege that Senvest Management "understood that the IRS was satisfied with its response" and that the monthly and quarterly statements satisfied the August 2024 Senvest Summons. (*See* ECF 1, Pet. ¶ 30.) However, according to Petitioners, the IRS then explained that the CRA wanted the IRS to seek information directly from Morgan Stanley. (*See id.* ¶ 31.)

During a conference call on November 21, Senvest Management represented that while it had the daily transaction data in raw data format, it would be burdensome to go through the data, redact or withhold data relating to other clients, and release data specific to the Funds. (*See* ECF 18, Nguyen Decl. ¶ 18.) On December 5, the IRS and Senvest Management engaged in another conference, during which Senvest Management reiterated its burden arguments. (*See id.* ¶ 19.) The IRS informed Senvest Management that the IRS was not planning to pursue further enforcement activities against Senvest Management and was instead planning to issue a third-party summons to Morgan Stanley to request the daily transaction records. (*See id.* ¶ 20.)

On January 31, 2025, the IRS issued a summons to Morgan Stanley & Co. LLC and Morgan Stanley Fund Services USA LLC (the "Summonses") via UPS. (*See id.* ¶ 21; ECF 18-5, UPS Receipts at 2.) The Summonses sought "all documents that are or reflect investment account

statements, financial activity reports, database entries, or other accounting data that detail any individual transaction involving securities or other financial instruments owned by or in the name of" Senvest Technology and Senvest. (ECF 18, Nguyen Decl. ¶ 21; ECF 18-3, Summons to Morgan Stanley Fund Serv. at 6; ECF 18-4, Summons to Morgan Stanley & Co. at 6.) On the same day, the IRS also sent, via certified mail, a notice of the Summonses to Senvest, Senvest Technology, Senvest Capital, Richard Mashaal, and Jefferson Northern Inc. (*See* ECF 18-8, Certified Mail Receipts to Notices at 2-3.) Subsequently, in accordance with the notice requirements of 26 U.S.C. § 7603(b), the IRS re-sent the Summonses by certified mail on May 13, 2025. (*See* ECF 18-7, Morgan Stanley Certified Mail Receipts at 2-3.)

Hoa Nguyen, Senior Program Analyst at the IRS, averred that the information shared by the CRA provided a "reasonable basis to believe that the Summonses may produce information relating to the [CRA's] audit of the Canadian Taxpayers." (ECF 18, Nguyen Decl. ¶ 30.) Thus, the IRS determined that it was appropriate under the Treaty's guidelines for the United States to honor the CRA request. (*See id.*) Nguyen stated that the Summonses were not issued to harass or for any other improper purpose; that the requested information was not in the possession of the IRS; that the IRS complied with all administrative steps required by the Internal Revenue Code (the "Code"); and that during the IRS's communications with Senvest Management, the company never asserted that the requested records contained confidential business information or trade secrets that should not be disclosed to Canada. (*See id.* ¶¶ 25-28.)

Harilaos Trahanas, Chief Compliance Officer for Senvest Management, stated that the daily transaction records requested in the Summonses contained trade secrets, in that the records reveal the Funds' distinct method of entering and exiting investment positions, as well

6

as the order in which the Funds make their investments. (*See* ECF 21, Declaration of Harilaos

Trahanas ("Trahanas Decl.") ¶ 18.) Trahanas also asserted that the Summonses could trigger

circumstances allowing Morgan Stanley to unilaterally terminate its fund administration

relationship with the Funds, which would be detrimental to the Funds' operations and business

interests. (*See id.* ¶¶ 11-12.)

## II.

### Procedural History

On February 19, 2025, Petitioners filed the Petition. (*See* ECF 1, Pet.) On February 21,

2025, Judge Gregory H. Woods referred this action to me for general pretrial supervision and

reports and recommendations on dispositive motions. (*See* ECF 4, Order of Ref.) On May 14,

2025, Respondent filed the Motion, supported by a Memorandum of Law in Opposition to the

Petition, the Declaration of Hoa Nguyen, and the Declaration of Patricia Thomas. (*See* ECF 16,

Mot.; ECF 17, Respondent's Mem.; ECF 18, Nguyen Decl.; ECF 19, Thomas Decl.) On June 13,

2025, Petitioners filed their Opposition to the Motion and the Declaration of Harilaos Trahanas.

(*See* ECF 20, Petitioners' Opp; ECF 21, Trahanas Decl.) On June 27, 2025, Respondent filed its

Reply Memorandum in further support of the Motion and the Supplemental Declaration of

Patricia Thomas. (*See* ECF 22, Respondent's Reply; ECF 23, Thomas Decl. Supp.) On September

6, 2025, the parties consented to my authority to conduct all proceedings in this case and order

the entry of a final judgment. (*See* ECF 26, Consent to J.)

**III.**

**<u>LEGAL STANDARDS</u>**

**A.    Motions To Quash an IRS Summons**

The Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1964), governs motions to quash an IRS summons. *See Adamowicz v. United States*, 531 F.3d 151, 156 (2d Cir. 2008). Courts have applied the *Powell* framework in the context of IRS summonses issued pursuant to a treaty partner's request. *See, e.g.*, *United States v. Stuart*, 489 U.S. 353, 359-60 (1989) (involving summonses issued under the Convention between the United States and Canada Respecting Double Taxation).

Under *Powell*, "[t]he IRS must make a prima facie showing that: (1) the investigation will be conducted pursuant to a legitimate purpose, (2) the inquiry may be relevant to the purpose, (3) the information sought is not already within the Commissioner's possession, and (4) the administrative steps required by the Code have been followed." *Adamowicz*, 531 F.3d at 156. (quoting *Powell*, 379 U.S. at 57-58). "[T]he government's burden of proof of its compliance with the *Powell* standards is minimal," *United States v. White*, 853 F.2d 107, 111 (2d Cir. 1988), because the IRS's investigatory power "is quite broad," and the *Powell* standards are "designed to ensure only the basic propriety of the investigation." *Mollison v. United States*, 481 F.3d 119, 122 (2d Cir. 2007). "[A]n affidavit from the IRS is sufficient to establish the prima facie elements under *Powell*." *Adamowicz*, 531 F.3d at 156; *see also White*, 853 F.2d at 111 ("[T]he government may even establish its prima facie case by the affidavit of an agent involved in the investigation averring each *Powell* element.").

"Once the IRS has established its prima facie case, the burden shifts to the taxpayer to disprove one of the four *Powell* criteria, or to demonstrate that judicial enforcement would be an abuse of the court's process." *Adamowicz*, 531 F.3d at 156. It is at this stage that the court considers the taxpayer's challenge to the legitimacy of the IRS's declared purpose and "inquire into the underlying reasons for the examination." *White*, 853 F.2d at 112 (quoting *Powell*, 379 U.S. at 58). The taxpayer's burden in disproving one of the *Powell* criteria is a "heavy" one. *Adamowicz*, 531 F.3d at 156. The taxpayer must oppose the government's prima facie case by affidavit; legal conclusions or memoranda do not suffice. *See Perdomo v. United States*, No. 24-CV-5048 (JHR) (VF), 2025 WL 3633627, at *4 (S.D.N.Y. Oct. 14, 2025) (citing *High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1183 (10th Cir. 2019)), *report and recommendation adopted,* 2025 WL 3633440 (S.D.N.Y. Dec. 15, 2025). "The imposition of a heavier burden on the taxpayer in a summons enforcement proceeding is intended to facilitate the IRS's investigative process." *White*, 853 F.2d at 111. In *White*, the Second Circuit explained that "[s]ummons enforcement proceedings are intended to be summary in nature so that an investigation can advance to an ultimate determination as to whether tax liability exists." *Id.* Thus, so long as the IRS has a valid purpose in issuing its summons, it does not matter whether the IRS is likely to establish liability on the taxpayer's part. *Id.*

1.    Legitimate Purpose

"American administrative procedures (which include the administrative summonses in issue here) are properly utilized where the purpose is solely to assist the investigation of a Canadian potential tax liability." *United States v. A. L. Burbank & Co.*, 525 F.2d 9, 16-17 (2d Cir. 1975) (involving the 1942 predecessor to the Treaty). The legitimacy of the summons depends

on whether the IRS itself acted in good faith and complied with both the *Powell* standards and applicable statutory obligations; the good faith of the requesting country is irrelevant. *See, e.g.*, *Stuart*, 489 U.S. at 370 (concluding that so long as the IRS acted in good faith and complied with applicable statutes, it is entitled to enforce its summons); *Guglielmi v. United States*, No. 12-CV-6007 (WHP), 2013 WL 1645718, at *2 (S.D.N.Y. Apr. 15, 2013) ("To enforce a summons, the IRS is not required to assess the adequacy of [the treaty partner's] tax law or practices."); *Hanse v. United States*, No. 17-CV-4573, 2018 WL 1156201, at *4 (N.D. Ill. Mar. 5, 2018) (collecting cases). Requiring the IRS either to attest to or prove the good faith of the requesting nation would "unwisely necessitate an inquiry into the propriety of the [foreign tax authority's] actions under [foreign] law" and undermine the basic purpose of U.S. bilateral tax treaties to facilitate cooperation between the nations to prevent fraud and fiscal evasion. *See Guglielmi*, 2013 WL 1645718, at *2.

      2.   <u>Relevance</u>

The second *Powell* factor is satisfied if the inquiry may be relevant to the purpose of the investigation. It is sufficient that the summons "might have thrown light upon" the object of the investigation. *In re McVane*, 44 F.3d 1127, 1136 (2d Cir. 1995). Courts generally defer to the agency's appraisal of relevance, which "must be accepted so long as it is not obviously wrong." *Id.*; *see also PAA Mgmt., Ltd. v. United States*, 962 F.2d 212, 216 (2d Cir. 1992) ("In view of the Code's broad delegation of summons authority to the IRS, the requirements that a summons have a legitimate purpose and relevance have been interpreted liberally in favor of the IRS.").

3.      Whether the Information Sought Is in the IRS's Possession

Courts have construed the "already possessed" exception to the enforcement of IRS summonses narrowly. *See Adamowicz*, 531 F.3d at 159. The test is whether the "examination is unnecessarily duplicative of some prior examination." *United States v. Millman*, 650 F. Supp. 508, 517 (E.D.N.Y. 1986) (quoting *United States v. Davey*, 543 F.2d 996, 1000 (2d Cir. 1976)), *aff'd*, 822 F.2d 305 (2d Cir. 1987). The information sought is not within the IRS's possession when the taxpayer previously provided selective and incomplete documents. *See Lahasky v. United States*, No. 09-MC-688 (JS), 2010 WL 2671803, at *3 (E.D.N.Y. June 28, 2010); *see also Adamowicz*, 531 F.3d at 159 ("Although there may be some redundancy between the documents sought and those already produced, that in itself does not require" quashing the summonses.).

4.      Administrative Steps

The fourth *Powell* factor requires the IRS to comply with the Code's administrative procedures: "in particular," the IRS must determine "after investigation" that the further investigation is "necessary" and must "notif[y] the taxpayer in writing to that effect." *Powell*, 379 U.S. at 58. Under 26 U.S.C. § 7603(b)(1), a summons for production of records by a third-party recordkeeper may be served by certified or registered mail; Section 7609(a) requires the IRS to serve a notice and copy of the summons on the taxpayer within three days of serving a summons on a third party.

5.      Abuse of Process

"An abuse of the court's process occurs if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute,

or for any other purpose reflecting on the good faith of the particular investigation."
*Adamowicz*, 531 F.3d at 156 (quoting *Powell*, 379 U.S. at 58). The taxpayer meets the burden of
proof by "alleg[ing] specific facts from which a court might *infer a possibility* of some wrongful
conduct by the Government." *Adamowicz*, 531 F.3d at 160 (quoting *United States v. Millman*,
765 F.2d 27, 29 (2d Cir. 1985)). "[C]ircumstantial evidence can suffice to meet that burden; after
all, direct evidence of another person's bad faith, at this threshold stage, will rarely if ever be
available." *United States v. Clarke*, 573 U.S. 248, 254 (2014).

The Second Circuit has held that "claims of summonses being overbroad generally do
not avail, except in limited circumstances." *Adamowicz*, 531 F.3d at 157. A summons is
overbroad if it is "out of proportion to the end sought," if it is "so unrelated to the matter
properly under inquiry," or if it fails to "advise the summoned party what is required of him with
sufficient specificity." *Id.* That "the summonses do request a great deal of information and
documents" does not by itself render the request overly broad if the documents sought are
relevant to the investigation. *Id.* at 158. In addition, because Section 7609 specifically
contemplates issuing summonses to third-party recordkeepers, there is no basis for assuming
that issuing such summonses constitutes an abuse of process and wrongful interference with
the contractual relationship between the taxpayer and the summoned recordkeeper. *See
Cybulski v. United States*, No. 84-CV-4347 (JFK), 1984 WL 1222, at *3 (S.D.N.Y. Nov. 9, 1984).

**B.    Interpretation of the Treaty**

Article XXVII, paragraph 1 of the Treaty provides that

[t]he competent authorities of the Contracting States shall exchange such
information as may be relevant for carrying out the provisions of this Convention
or of the domestic laws of the Contracting States concerning taxes to which this

> Convention applies insofar as the taxation thereunder is not contrary to this Convention.

(ECF 23, Thomas Decl. Supp. ¶ 3; ECF 23-1, 2007 Protocol Amending the Treaty, Art. 23.)

Paragraph 3 of the same Article further provides that the Treaty does not impose on Contracting States the obligation to "supply information which would disclose any trade, business, industrial, commercial or professional secret or trade process, or information the disclosure of which would be contrary to public policy (ordre public)." (ECF 23-1, 2007 Protocol Amending the Treaty, Art. 23.)

When interpreting a treaty, a court "begin with the text of the treaty and the context in which the written words are used." *Badar v. Swissport USA, Inc.*, 53 F.4th 739, 746 (2d Cir. 2022). "Because a treaty ratified by the United States is not only the law of this land but also an agreement among sovereign powers, [courts] have traditionally considered as aids to its interpretation the negotiating and drafting history . . . and the postratification understanding of the contracting parties." *Id.* at 747 (quoting *El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 167 (1999)). Courts interpreting U.S. bilateral tax treaties have relied on the Treasury Department's Technical Explanation of the treaties. *See Azouz v. United States*, No. 99-CV-0020 (AKH), 1999 WL 1581401, at *1 (S.D.N.Y. Dec. 14, 1999) (citing the Treasury Department's Technical Explanation of Article XXVII of the Treaty); *Mazurek*, 271 F.3d at 233 (interpreting the U.S. bilateral tax treaty with France based on the Treasury Department's Technical Explanation). When a term is not defined by a treaty, a court may consult dictionary definitions in aid of its interpretation. *See Badar,* 53 F.4th at 747.

Regarding Article XXVII, paragraph 3, the Treasury Department Technical Explanation of the Treaty (the "Technical Explanation") provides that,

> [w]hile paragraph 3 states conditions under which a Contracting State is not obligated to comply with a request from the other Contracting State for information, the requested State is not precluded from providing such information, and may, at its discretion, do so subject to the limitations of its internal law.

(*See* ECF 19, Thomas Decl. ¶ 22; ECF 19-2, Tech. Explanation to US-Canada Tax Treaty ("Tech. Expl. Treaty") at 49.)[3] Neither the Treaty nor the Technical Explanation defines the term "trade secret." According to Black's Law Dictionary, a trade secret is "[a] formula, process, device, or other business information that is kept confidential to maintain an advantage over competitors." *Trade Secret*, *Black's Law Dictionary* (8th ed. 2004). The Uniform Trade Secrets Act, enacted by 49 States plus Puerto Rico and the U.S. Virgin Islands, defines "trade secret" as any information, including a formula, pattern, method, or technique, that "(1) derives independent economic value, actual or potential, from not being generally known or readily ascertainable by others who can obtain economic value from its disclosure or use, and (2) is the subject of reasonable efforts, under the circumstances, to maintain its secrecy." Unif. Trade Secrets Act § 1 (Unif. L. Comm'n 1985).

Courts in the Second Circuit have not previously ruled on whether the assertion of a trade secret is a valid ground to quash an IRS summons. In *United States v. Cox*, the U.S. District Court for the Southern District of Texas concluded that, at that time, "[n]o court ha[d] held that trade secret laws could limit the IRS's summons power." 73 F. Supp. 2d 751, 765 (S.D. Tex. 1999).

---

[3]     The Technical Explanation is "an official United States guide" to the Treaty. (ECF 19-2, Tech. Expl. Treaty at 1.) According to the Technical Explanation, both the United States and Canada agree that the Technical Explanation "accurately reflects the policies behind particular [Treaty] provisions, as well as understandings reached with respect to the application and interpretation of the [Treaty]." (*Id.*)

There, the IRS sought to enforce its summons for the computer source code developed by the taxpayer. *Id.* at 755. The IRS did not dispute that the source code was a trade secret, but the court concluded that trade secret protection did not constitute a "substantial countervailing policy" that could override the enforcement of a summons. *Id.* at 766.

**IV.**

**Analysis**

A.    **Respondent Has Established a Prima Facie Case Under *Powell***

1.    <u>The Parties' Positions</u>

Citing *Adamowicz*, Respondent argues that the Nguyen and Thomas Declarations establish a prima facie under *Powell* case by showing that (1) the IRS reviewed the CRA's request and determined that it was properly made under the Treaty; (2) the Requested Documents were relevant based on the information contained in the Ledger, which showed that over 50% of the Funds' investment positions between 2016 and 2018 were held for fewer than 30 days; (3) the IRS did not possess the daily transaction records; and (4) the IRS followed the administrative steps under Sections 7603 and 7609. (*See* ECF 17, Respondent's Mem. at 14-17.)

Petitioners counter that Respondent has failed to establish a prima facie case under *Powell*, asserting that the Nguyen and Thomas Declarations are insufficient to make a prima facie showing that the CRA's request was proper under the Treaty, for two reasons. Petitioners assert that in a meeting with Senvest Management on November 1, 2024, Nguyen stated that "we thought we were done," which Petitioners speculate reflected Nguyen's belief that the Summonses were unnecessary. (*See* ECF 20, Petitioners' Opp. at 7-9, 12.) And Petitioners argue

that the Nguyen and Thomas Declarations are premised on allegedly inaccurate information provided by the CRA. (*See id.* at 7-8.)

2.    Discussion

Because "an affidavit from the IRS is sufficient to establish the prima facie elements under *Powell*," *Adamowicz*, 531 F.3d at 156, the Nguyen and Thomas Declarations are enough to meet Respondent's "minimal" burden of making out a prima facie case here. *White*, 853 F.2d at 111. I consider Petitioners' arguments to the contrary in assessing whether Petitioners have "disprove[d] one of the four *Powell* criteria" or "demonstrate[d] that judicial enforcement would be an abuse of the court's process." *Adamowicz*, 531 F.3d at 156.

**B.    Petitioners Have Failed To Disprove Respondent's Prima Facie Case**

1.    The Purpose of the Summonses Is Legitimate

Petitioners maintain that Respondent lacked a legitimate purpose for seeking the Summonses, because the IRS failed to make the required investigation into the propriety of the CRA's request and to determine that further examination was necessary. Relying on Nguyen's alleged statement that "we thought we were done," Petitioners argue that the Summonses cannot be legitimate, because the IRS itself believed that the CRA's request for daily transaction records was unnecessary. (*See* ECF 20, Petitioners' Opp. at 11.) And according to Petitioners, the IRS's choice – to base the Summonses on what Petitioners characterize as erroneous representations by the CRA about the Funds' investment turnover rates reflected in the Ledger – further rebuts Respondent's prima facie case that the Summonses had a legitimate purpose. (*See id.*) Respondent counters that Petitioners have failed to make the requisite evidentiary showing and that even if they had supported their contentions with competent evidence, the

IRS had no obligation to second guess the CRA's requests. (*See* ECF 22, Respondent's Reply at 2-3, 5, 8.)

Petitioners' arguments do not carry their "heavy" burden to disprove one of the *Powell* criteria. *Adamowicz*, 531 F.3d at 156. At the most basic level, Petitioners have not made the required *factual* showing. Petitioners say that Nguyen told Senvest Management that he thought they were done; Petitioners make this point in a legal memorandum (*see* ECF 20, Petitioners' Opp. at 4, 7, 11-12, 14), which is not a cognizable method of rebutting a prima facie case under *Powell*. *See Perdomo*, 2025 WL 3633627, at *4. Moreover, a statement by an IRS agent that he had believed an inquiry on behalf of the CRA was complete does not require an inference that the agent thought that further investigation would be inappropriate. And Petitioners' position that the Ledger overstates the Funds' investment turnover rates (*see* ECF 20, Petitioners' Opp. at 11) is based on two Quarterly Position Turnover Reports for 2016 to 2018 prepared by Morgan Stanley for Senvest (the "Quarterly Turnover Reports") and attached as exhibits to Petitioners' opposition to the Motion (*see* ECF 20, Petitioners' Opp. Ex. A, Quarterly Turnover Reports); but Petitioners neglected to authenticate the Quarterly Turnover Reports or to have anyone testify to their accuracy, and the Quarterly Turnover Reports therefore are not admissible. *See also Dorchester Fin. Holdings Corp. v. Banco BRJ, S.A.*, No. 11-CV-1529 (KMW) (KNF), 2014 WL 3747160, at *5 (S.D.N.Y. July 3, 2014) (holding that "[a]ttaching exhibits in support of the motion to a memorandum of law is improper" under the Federal Rules of Evidence and that since no affidavit accompanied the exhibits plaintiff attached to the memorandum of law, they cannot be considered by the court).

As a substantive matter, Petitioners' contention that the purpose of the Summonses is illegitimate because the IRS believed the CRA request to be improper (*see* ECF 20, Petitioners' Opp. at 10) misapprehends the IRS's investigatory obligations. The IRS must determine that the CRA's request (and the IRS's compliance) are proper under the Treaty, which provides:

> The competent authorities of the Contracting States shall exchange such information as may be relevant for carrying out the provisions of this Convention or of the domestic laws of the Contracting States concerning taxes to which this Convention applies insofar as the taxation thereunder is not contrary to this Convention . . . .

(*See* ECF 23-1, 2007 Protocol Amending the Treaty, Art. 23.) Thus, the IRS's obligation under the Treaty is to assist the CRA with obtaining information "as may be relevant" in assessing the Canadian Taxpayers' liability.

The IRS provided evidence that it decided that the CRA's request was proper under the Treaty's guidelines: the IRS communicated with the CRA to understand the CRA's need for the daily transaction records and why the monthly and quarterly statements were insufficient, and the IRS concluded that there was a reasonable basis to believe that the Summonses might yield information relating to the CRA's audit of the Canadian Taxpayers. (*See* ECF 18, Nguyen Decl. ¶¶ 15, 30.) Thus, the record reflects that the IRS investigated and concluded that further examination was necessary because the Summonses could assist the CRA in assessing the Canadian Taxpayers' liability. Even if Nguyen did say that he had thought the investigation was complete, and even if one interprets the statement to mean that Nguyen believed the CRA had enough information for its audit, his comment would not make the CRA's request for further information contrary to the Treaty's guidelines, because the IRS should not second guess the CRA's facially reasonable requests. *See, e.g.*, *Stuart*, 489 U.S. at 370; *Guglielmi,* 2013 WL

1645718, at *2. Put another way, assisting the investigation of a foreign tax authority is, by definition, a legitimate purpose. *See, e.g.*, *A. L. Burbank*, 525 F.2d at 16-17.

Petitioners' further argument – that the IRS's conclusion that the CRA's request was proper was "objectively false" because the CRA's interpretation of the Ledger was contradicted by the Quarterly Turnover Reports – also is substantively flawed. While Petitioners argue that the Quarterly Turnover Reports show that the Funds' average turnover rate from 2016 to 2018 was much less than the 52% reflected in the Ledger (*see* ECF 20, Petitioners' Opp. at 9; *id.* Ex. A., Quarterly Turnover Reports), Respondent counters that the Quarterly Turnover Reports reflect the turnover rates for selected portions of Senvest's portfolio and therefore that the Quarterly Turnover Reports are not comparable to the Ledger. (*See* ECF 22, Respondent's Reply at 5.)[4]

These efforts by Petitioner to rebut Respondent's prima facie case that the Summonses had a legitimate purpose run afoul of the caselaw holding that the legitimacy of a summons depends on whether the *IRS* acted in good faith and complied with both the *Powell* standards and applicable statutory obligations, not on whether the *requesting country* acted in good faith. *See, e.g.*, *Stuart*, 489 U.S. at 370; *Guglielmi*, 2013 WL 1645718, at *2. As this Court explained in

---

[4]    The first Quarterly Turnover Report shows quarterly turnover rates between 2016 and 2018 for the selected portion of Senvest's positions (long positions other than (a) shares received through Initial Public Offerings and (b) positions that made up less than 2% of Senvest's portfolio) ranging from 2% to 27%, with only two quarters exceeding 10% and an average quarterly turnover rate of approximately 11% based on my calculation. (*See* ECF 20, Petitioners' Opp. Ex. A, Quarterly Turnover Reports at 2.) The second Quarterly Turnover Report reflects quarterly turnover between 2016 and 2018 for all long positions held by Senvest and shows turnover rates ranging from 16% to 66%, with an average quarterly turnover rate around 36% based on my calculation. (*See id.* at 4.) If gross market exposure is considered (in other words, if the turnover rates are adjusted for the size of each position), quarterly issuer turnover exceeded 20% in only two quarters between 2016 and 2018. (*See id.*) And Senvest Technology had a lower turnover ratio than Senvest. (*See* ECF 21, Trahanas Decl. ¶ 16.)

*Guglielmi*, requiring the IRS either to attest to or prove the good faith of the requesting nation would "unwisely necessitate an inquiry into the propriety of the [foreign tax authority's] actions under [foreign] law" and undermine the basic purpose of U.S. bilateral tax treaties. 2013 WL 1645718, at *2. Assisting the investigation of a foreign tax authority is by definition a legitimate purpose. *See, e.g.*, *A. L. Burbank*, 525 F.2d at 16-17. Respondent therefore is correct that the IRS was not required either to agree with the CRA's view that the Summonses were necessary or to analyze and confirm the accuracy of the Ledger. Because Petitioners have offered no competent evidence that the IRS had any improper reason for relying on the CRA's representations, I conclude that the Summonses were issued for a legitimate purpose. *See Mazurek*, 271 F.3d at 231-32 (denying motion to quash because plaintiff failed to show that the IRS was acting in bad faith in complying with the French Tax Authority's request).

2.    The Summonses Seek Relevant Information

Petitioners' arguments to rebut Respondent's prima facie showing of relevance mirror their arguments on the legitimate purpose factor and fall short for the same reasons. Petitioners contend that the Quarterly Turnover Reports show that the CRA's analysis of the Ledger was inaccurate and that the daily transaction records were not relevant. (*See* ECF 20, Petitioners' Opp. at 12-13*.)* Respondent counters that Petitioners cannot oppose the IRS's case through a memorandum of law alone; that the Quarterly Turnover Reports present an incomplete picture of the Funds' quarterly turnover rates between 2016 and 2018; and that the Summonses seek relevant information because there might be transactions reflected in the daily transaction records that are not contained in the monthly and quarterly statements. (*See* ECF 22, Respondent's Reply at 5.)

I am mindful that courts generally defer to an agency's appraisal of relevance and that the documents sought by the Summonses are relevant if they "might throw light upon" the object of the investigation, *McVane*, 44 F.3d at 1136, which is determining whether the Canadian Taxpayers owe any taxes for tax years 2016 to 2021 (*see* ECF 18, Nguyen Decl. ¶¶ 3-4). Here, even if the Funds' average quarterly turnover rate between 2016 and 2018 was less than 52%, the daily transaction records "might throw light upon" whether the Canadian Taxpayers owe any taxes for tax years 2016 to 2021, because the daily records could include transactions that are missing from the monthly and quarterly statements. (*See id.* ¶ 15.)

      3.     <u>The Documents Sought Are Not in the Possession of the IRS</u>

Petitioners argue that the CRA and the IRS possessed all relevant information before the IRS issued the Summonses, because the daily transaction records are "functionally equivalent" to the monthly and quarterly reports previously produced by Senvest Management. (*See* ECF 20, Petitioners' Opp. at 12.) However, Petitioners have failed to rebut the prima facie showing that the monthly and quarterly statements omitted positions that were held for fewer than 30 days and thus were incomplete, *see supra* Part IV(B)(1), and so the Summonses are not "unnecessarily duplicative," and Petitioners have failed to disprove the third *Powell* factor. *Millman*, 650 F. Supp. at 517; *Lahasky*, 2010 WL 2671803, at *3.

      4.     <u>The IRS Followed the Administrative Steps Required by the Code</u>

The parties do not dispute that the IRS followed the service and notice requirements under 26 U.S.C. § 7603(b)(1) and § 7609(a). Instead, Petitioners argue that the IRS failed to fulfill the requirement that, "after investigation," the IRS must "determine[ ] the further investigation to be necessary." *Powell*, 379 U.S. at 57-58. This repackaging of Petitioners' argument on the

legitimate purpose factor does not change the conclusion that Nguyen's alleged statement that he had thought the investigation to be complete and Petitioners' critique of the CRA's analysis of the Ledger are insufficient to rebut Respondent's prima facie case. *See supra* Part IV(B)(1).

      5.     <u>The Issuance of the Summonses Was Not an Abuse of Process</u>

Petitioners proffer several reasons for their conclusion that the IRS engaged in an abuse of process by issuing the Summonses. Petitioners maintain:

- That the IRS issued the Summonses in bad faith even though it knew that the Summonses were duplicative of previous requests with which Petitioners complied by producing monthly and quarterly transaction documents to the IRS and the CRA. (*See* ECF 20, Petitioners' Opp. at 16.)

- That the CRA understood that issuing the Summonses could damage the Funds' critically important relationship with Morgan Stanley but still pushed the IRS to issue the Summonses based on the CRA's erroneous analysis of the Ledger, "perhaps to force a more favorable result as part of [the] audit." (*See* ECF 1, Pet. ¶ 40; ECF 20, Petitioners' Opp. at 16-18.)

- That the Summonses were overbroad and unduly burdensome because they seek "all documents" rather than a more limited subset. (*See* ECF 1, Pet. ¶¶ 39, 41.)

As to the first point, Petitioners have failed to show that CRA's analysis of the Ledger was flawed, *see supra* Part IV(B)(1); as a result, Petitioners have not demonstrated that the Summonses were unnecessarily duplicative. The information sought plausibly could shed light on investment positions missing from the monthly and quarterly statements (*see* ECF 18, Nguyen Decl. ¶ 15), which is relevant to the CRA's audit of the Canadian Taxpayers. Therefore, the IRS's issuance of the Summonses was not in bad faith. *See Adamowicz*, 531 F.3d at 160 (holding that taxpayer must allege specific facts from which a court might infer a possibility of some wrongful conduct by the Government).

With regard to the second point, Respondent is correct that Petitioners' arguments about the potential harm to the Funds' relationship with Morgan Stanley – and about the motives of the IRS and the CRA – are speculative. (*See* ECF 22, Respondent's Reply, at 6.) The only substantiation offered by Petitioners is the unproven assertion that the Summonses were unnecessarily duplicative and the contention that the CRA's "understand[ing]" of "the importance of the Morgan Stanley relationship" with the Funds supports an inference that the CRA had improper motives (ECF 20, Petitioners' Opp. at 16). But 26 U.S.C. § 7609 specifically authorizes the issuance of summonses to third-party recordkeepers, which undermines any inference of CRA or IRS wrongdoing based solely on the issuance of Summonses to Morgan Stanley, which is just such a third-party recordkeeper. *See Cybulski*, 1984 WL 1222, at *3 (holding that IRS did not wrongfully interfere with petitioner's contractual relationship with a third-party recordkeeper by issuing a summons to the latter).

Petitioners' contention that the Summonses are overbroad fares no better. Seeking "[a]ll documents" on a particular topic does not automatically make a subpoena overbroad. *See Adamowicz*, 531 F.2d at 158. Petitioners have not demonstrated that the Summonses are "out of proportion to the end sought" or "unrelated to the matter properly under inquiry." *Id.* at 157. To the contrary, the Summonses specified the types of documents requested and the relevant period, and Nguyen explains how the information sought may be relevant to assisting the CRA's audit of the Canadian Taxpayers. (*See* ECF 18, Nguyen Decl. ¶¶ 15-16.).

Under the circumstances, I conclude that Petitioners have failed to rebut Respondent's prima facie showing that issuance of the Summonses was not an abuse of process. *See Mollison*, 481 F.3d at 122-23 (holding that the taxpayer's burden to rebut the prima facie showing is a

"heavy" one, and that the taxpayer must disprove "the actual existence of a valid civil tax determination or collection purpose" by the IRS).

### C.     Trade Secrets Within the Requested Documents Do Not Require Quashing the Summonses

Petitioners argue that the Summonses should be quashed on the further ground that the Summonses seek documents containing confidential business information that, if released, could cause substantial commercial harm to the Funds. (*See* ECF 20, Petitioners' Opp. at 18-22; ECF 1, Pet. ¶ 43.) According to Petitioners, the daily transaction records sought by the Summonses, unlike the monthly and quarterly statements previously provided to the IRS and the CRA, reveal the manner or sequence in which the Funds make and exit their investments. (*See* ECF 20, Petitioners' Opp. at 20-21; ECF 21, Trahanas Decl. ¶ 18.) Petitioners also assert that the Ledger contains confidential information and was disclosed inadvertently by the Funds to the CRA; Petitioners contend that the Funds' Cayman Islands' counsel previously demanded that the CRA immediately cease using the data from the Ledger. (*See* ECF 20, Petitioners' Opp. at 21.) Because the Treaty does not require the IRS to provide information containing trade secrets to the CRA, Petitioners argue that the IRS need not pursue the Summonses. (*See id.* at 22.)

Respondent counters that the daily transaction records are similar to the monthly and quarterly statements produced to the IRS and the CRA and do not contain trade secrets, and that even if the daily records did contain trade secrets, Petitioners never explain how disclosure to the IRS and the CRA would create any likelihood of public dissemination that could cause competitive harm. (*See* ECF 22, Respondent's Reply at 9.)

Respondent also takes the position that Petitioners' trade secrets claim is not a cognizable ground to quash an IRS summons, noting that while the Treaty does not *require* the

IRS to share documents containing trade secrets with the CRA, the Treaty does not *prevent* the IRS from doing so, consistent with U.S. law; Respondent concludes that the IRS has the discretion, after obtaining the daily records, to consider Petitioners' arguments about trade secrets before deciding whether to withhold those records from the CRA. (*See* ECF 17, Respondent's Mem. at 20-22; ECF 19, Thomas Decl. ¶ 22.)

Assuming without deciding that the daily trading records reveal Petitioners' confidential trading methods and that those methods qualify as trade secrets, I nevertheless conclude that the Summonses need not be quashed. The Code does not prohibit the IRS from requesting confidential business information or documents containing trade secrets, and the Treaty does not preclude the IRS from sharing such information with the CRA. "No court has held that trade secret laws could limit the IRS's summons power." *Cox*, 73 F. Supp. 2d at 765. Petitioners attempt to distinguish *Cox* on the basis that the case did not involve a treaty-based request, but as the Technical Explanation makes clear, Article XXVII, paragraph 3 of the Treaty does not prevent the IRS from sharing information containing trade secrets at its discretion and *subject to the limitations of U.S. law*. Petitioners have not pointed to any precedent prohibiting the IRS from summoning information that contains trade secrets, and I have not identified any such precedent through my own research. I therefore conclude that the Treaty does not require the Summonses to be quashed. *Cf. Mazurek*, 271 F.3d at 233 (holding, based on similar language contained in the U.S. bilateral tax treaty with France, that although the treaty does not "*mandate* the exchange of information" in such scenarios, "neither does the plain language of the Treaty forbid compliance with an otherwise proper treaty request").

**V.**

**<u>CONCLUSION</u>**

For the reasons set forth above, the Petition (ECF 1) is DENIED and the Motion (ECF 16)

is DENIED AS MOOT. The Clerk of Court is respectfully requested to terminate ECF 1 and ECF 16

and to enter judgment in favor of Respondent.

DATED:  March 6, 2026
      New York, New York

SO ORDERED.

_____
**ROBYN F. TARNOFSKY**
United States Magistrate Judge